UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LOREN L. LEISER,

        Plaintiff,

    v.                                     Case No. 20-cv-0123-bhl

KIRA LABBY, et al.,

        Defendants.

---

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

      Plaintiff Loren Leiser, an inmate at the Redgranite Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims based on allegations that Defendants were deliberately indifferent to his back and hip pain. On September 16, 2021, Defendants filed a motion for summary judgment, which is fully briefed and ready for the Court's decision. The Court will grant in part and deny in part Defendants' motion.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

      Under the Prison Litigation Reform Act (PLRA), "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Before turning to the merits of Leiser's claims, the Court will address Defendants' argument that many of Leiser's claims must be dismissed because he failed to exhaust the available administrative remedies before initiating this lawsuit. Exhaustion of administrative remedies must be done "properly" because "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."

*Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). To properly exhaust administrative remedies, prisoners must file their inmate complaints and appeals in the place, at the time, and in the manner that the institution's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). It is well settled that an inmate's grievance must "alert[] the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002); *see also* Wis. Admin. Code §DOC 310.07(5) ("Each complaint may contain only one clearly identified issue."). This is because "the primary purpose of requiring an inmate to exhaust his administrative remedies is to alert the state to the problem and invite corrective action." *Fluker v. County of Kankakee*, 741 F.3d 787, 794 (7th Cir. 2013) (internal quotation marks and citations omitted).

## I. The Record Confirms that Leiser Failed to Exhaust Several of His Claims.

### A. Leiser Failed to Exhaust the Administrative Remedies on Claims based on Alleged Misconduct that Occurred Prior to His Back Surgery.

Leiser asserts, in part, that Defendants Nurse Diane Brunk, health services manager Lori Doehling, and Dr. Dilip Tannan were deliberately indifferent to a back injury he suffered in December 2017. According to Leiser, Nurse Brunk gave him pain medication that she knew was ineffective and Doehling tried to "haggle a deal" to stop Leiser from requesting medical care. He also asserts that Dr. Tannan improperly delayed his back surgery, which ultimately was performed at the end of November 2018. Dkt. No. 11 at 2-3.

According to Defendants, Leiser began filing inmate complaints about the treatment of his back pain on December 18, 2018, *after* his back surgery. Dkt. No. 109 at ¶¶14, 17; Dkt. No. 116-1. Leiser filed five inmate complaints that day: RCGI-2018-25869 (about his transport from the hospital to the institution following back surgery); RCGI-2018-25870 (about a nurse responding to his health services requests rather than a doctor); RCGI-2018-25871 (about not receiving information about new medication); RCGI-2018-25872 (about not receiving proper pain

2

medication); and RCGI-2018-25873 (about the infirmary cell being inadequate for his needs). Dkt. No. 109 at ¶¶17-18, 20-22; Dkt. Nos. 116-1, 116-2, 116-3.

None of these inmate complaints raises concerns about improper treatment prior to his back surgery or a delay in receiving back surgery. Leiser does not dispute that he did not file an "inmate complaint" on these issues; instead, he asserts that he "filed numerous [health services requests] to HSU Manager Thompson, that is an Inmate Complaint, as she is the first staff member I would have to file an inmate complaint with . . . ." Dkt. No. 134 at ¶14. But, as Defendants point out, the filing of health services requests does not constitute proper exhaustion. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). The Seventh Circuit has explained that this circuit takes "a strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

In Wisconsin, exhaustion requires that prisoners comply with the procedures outlined in Wis. Admin. Code Ch. DOC 310. To start the process, a prisoner must file an inmate complaint (DOC-400 form) within fourteen calendar days of the incident giving rise to the complaint. Wis. Admin. Code § DOC 310.07(2). Leiser concedes that he did not file inmate complaints about the treatment he received prior to his back surgery or about the delay in receiving back surgery. Instead, he filed only health service requests, which does not comply with the procedures outlined in DOC 310. Because Leiser did not strictly comply with the exhaustion requirements, his claims against Brunk, Doehling, and Dr. Tannan regarding alleged misconduct that occurred prior to his back surgery must be dismissed without prejudice based on his failure to exhaust the available administrative remedies.

**B. Leiser Failed to Exhaust the Administrative Remedies on His Claims that Special Needs Committee Members (Terry Jaeger, Zachary Schroeder, and Ann Marie Wuest) Denied His Requests for "Medical Appliances."**

Defendants contend that Leiser failed to exhaust his claim that the members of the special needs committee denied his request for "medical appliances." They acknowledge that he filed an inmate complaint concerning his mattress that "caused severe spinal pain," but that inmate complaint was rejected, and Leiser did not properly appeal the rejection. Dkt. No. 109 at ¶24. Defendants highlight that, on May 10, 2021, the Court granted special needs committee member Darlene Wilkey's motion for summary judgment on exhaustion grounds, finding that Leiser had failed to properly appeal the rejection of his single inmate complaint regarding his request for a thick mattress. *Id.* at ¶25 (citing Dkt. No. 83). Leiser acknowledges that he did not appeal the rejection, but he asserts that no appeal was necessary because the institution complaint examiner determined the issue had been resolved. He also asserts that he did not file additional inmate complaints on this issue because his unit sergeant gave him another inmate's medical mattress. Dkt. No. 134 at ¶¶25-26.

The Court has already determined that Leiser failed to appeal the rejection of the single inmate complaint he filed about the special needs committee rejecting his requests for "medical appliances," *i.e.*, a medical mattress. *See* Dkt. No. 83 at 3. Leiser asserts now that an appeal and filing additional inmate complaints were unnecessary, but to exhaust state remedies, a prisoner must "properly take each step within the administrative process." By failing to do so, Leiser is "foreclosed by § 1997e(a) from litigating." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002); *see also Byrd v. Sitri*, 14 F. App'x 701, 702-03 (7th Cir. 2001) ("there is no futility exception to the exhaustion requirement of § 1997e(a)"). Accordingly, Leiser's claims against Jaeger, Schroeder, and Wuest must be dismissed without prejudice.

4

### C. Leiser Failed to Exhaust the Administrative Remedies on His Claim Against Nathan Beier for Allegedly Failing to Investigate Leiser's Inmate Complaints.

Defendants also assert that Leiser did not file any inmate complaints about Institution Complaint Examiner Beier's alleged failure to investigate Leiser's inmate complaints. Dkt. No. 109 at ¶32. Leiser disagrees. He states that he raised his concerns about Beier's alleged misconduct in inmate complaints RGCI-2018-25870, in the appeal of RGCI-10533, and in RGCI-2019-19743.

In RGCI-2018-25870, Leiser raises his disagreement with the institution's policy that allows nurses to respond to health services requests and notes that corrections officers failed to provide him with his pain medication. Dkt. No. 116-3 at 11. In RGCI-2019-19743, Leiser asserts that he is being denied treatment for his right leg pain. He notes that he has complained to the health services manager, but she has yet to respond or take corrective action. Dkt. No. 121-3 at 11. Neither of these inmate complaints raises concerns about an institution complaint examiner failing to investigate inmate complaints before recommending dismissal, so they were insufficient to give the institution notice of such a claim.

In RGCI-2019-10533 Leiser again complains about nurses responding to his health services requests and about not receiving medication for his GERD. Dkt. No. 121-2 at 11. In his appeal of that inmate complaint's dismissal, Leiser asserts that "[i]t's nothing new that ICE Beier doesn't believe my medical needs are not being met! He is not a medical person[nel]." *Id.* at 24. This comment is insufficient to exhaust the administrative remedies on this claim. First, the statement does not provide the institution with notice of Beier's alleged failure to investigate. At most, it signals that Leiser disagreed with Beier's conclusion to recommend dismissal of his inmate complaint. Second, the procedures to exhaust require inmates to first file an inmate complaint at the institution level and then to limit any appeals to issues raised in the inmate complaint. *See*

5

§§DOC 310.07, 310.09(2)(g).  Leiser's admission that he first raised his concerns about Beier's review of his inmate complaint on appeal (as opposed to raising those concerns in an inmate complaint) means that he did not properly exhaust because he did not strictly comply with the procedural rules.  Leiser's claim against Beier must be dismissed without prejudice.

## II. Leiser Has Sufficiently Exhausted His Remaining Claims, To the Extent They are Properly Before the Court in this Lawsuit.

### A. Leiser Exhausted the Administrative Remedies on His Claims that Officers Annette McGibbon and Todd Zamzow Withheld Pain Medications.

The screening order allowed Leiser to proceed on claims against McGibbon and Zamzow based on allegations that they refused to provide him with prescribed pain medication shortly after his surgery.  Dkt. No. 11 at 4.  On December 18, 2018, the institution complaint examiner received RGCI-2018-25870, in which Leiser complained that he "was placed on medication to be taken at certain times, by Dr. Tannan.  However, Security Officers who pass out medication refused to provide the[m] as required. . . . I was left to suffer in needless pain due to RN's refusal to give the HSR slip to the doctor, the only one who can change medication delivery times."  Dkt. No. 116-3 at 11.  Leiser went on to state, "This is a denial of my eighth amendment right to medical treatment and cruel & unusual punishment to leave a patient who just had spinal surgery to suffer in needless pain."  *Id.*

Defendants assert that Leiser failed to exhaust the administrative remedies on his claims against McGibbon and Zamzow because he identified the "one issue" in his inmate complaint as a nurse responding to the health services request that he addressed to his doctor and to which only his doctor could adequately respond.  According to Defendants, in light of the issue Leiser identified, the inmate complaint failed to provide the institution with notice that corrections officers were refusing to give Leiser his pain medication.

6

Defendants take too narrow a view of Leiser's inmate complaint. His inmate complaint needed only to "provide[] notice to the prison of the nature of the wrong for which redress [was] sought." *Schillinger v. Kiley*, 954 F.3d 990, 995 (7th Cir. 2020). The "wrong" Leiser was complaining about was the denial of his pain medication. He believed that the solution to that wrong was to change the procedures on how nurses triaged health services requests. But his assumption about the solution is irrelevant to the identified wrong, which was him being denied pain medication. Drawing all reasonable inferences in Leiser's favor, the Court concludes that the allegations in his inmate complaint "were sufficient to notify the prison of the nature of his concerns." *Moffet v. Garland*, No. 20-2376, 2021 WL 3362255, at *2 (7th Cir. Aug. 3, 2021); *see also Henry v. Deshler*, No. 20-2185, 2021 WL 2838400, at *2 (7th Cir. July 8, 2021). Accordingly, McGibbon and Zamzow are not entitled to summary judgment on the ground that Leiser failed to exhaust the available administrative remedies.

**B. Leiser Exhausted the Administrative Remedies on Claims Relating to the Alleged Lack of Treatment for his Post-Surgery Back, Hip, and Leg Pain (up to the filing of his amended complaint).**

In 2019, Leiser filed four inmate complaints, including RGCI-2019-19743, in which he stated, "Dr. Labby refuses to send me to WMH, orthopedic clinic to address and evaluate the right leg pain I am suffering. This visit will establish a course of treatment and pain management plan." He also explained, "I have had severe leg pain since my spinal operation on November 30, 2018. Since Dec. 30, 2018 I have complained and been denied treatment on the very painful condition of my right hip, right quadriceps, bilateral knees, lower leg pain by Dr. Labby." Dkt. No. 121-3. Leiser appealed the dismissal of his inmate complaint on January 2, 2020, and on January 23, 2020, the Office of the Secretary accepted the corrections complaint examiner's recommendation and dismissed the appeal. *Id.* at 7. Leiser filed this lawsuit four days later, on January 27, 2020.

7

Dkt. No. 1.  Leiser's inmate complaint was sufficient to provide the institution with notice of his concern that he was not receiving adequate treatment and accommodations for his leg and hip pain, including his belief that Dr. Labby should refer him to a specialist to diagnose the cause of the pain and create a plan of care to address the pain.  *See Moffett v. Garland*, No. 20-2376, 2021 WL 3362255, at *2 (7th Cir. Aug. 3, 2021) (holding that a grievance need only provide notice to the prison of the nature of the wrong).

On March 6, 2020, more than a month *after* Leiser filed this lawsuit, Dr. Labby ordered an orthopedic consult in an effort to diagnose and develop a plan of care for Leiser's hip pain.  Dkt. No. 91 at ¶15.  On April 28, 2020, Leiser filed an amended complaint, which is the operative complaint.  Dkt. No. 10.  More than two months later, on July 14, 2020, Leiser was seen by orthopedic surgeon Dr. Eric Nelson at Waupun Memorial Hospital for his right hip pain.  Dkt. No. 91 at ¶17.  After reviewing x-rays of Leiser's hip and pelvis, he strongly recommended a right total hip replacement.  *Id.* at ¶18.  About a week later, Dr. Labby submitted an authorization request form to approve Leiser for the surgery, but the surgery was not approved because of Leiser's body mass index, which is relevant because patients with a high BMI are at higher risk for adverse events following surgery, including poor wound healing, infections, hardware graft failure and blood clots.  *Id.* at ¶21.  On September 25, 2020, nearly eight months after Leiser initiated this lawsuit, he filed inmate complaint RGCI-2020-16541, wherein he complained that he had been denied hip surgery because he was refusing sex offender treatment and because of his criminal offense.  *See* Dkt. No. 116-1 at 2.

Although Leiser exhausted his claim that Dr. Labby was deliberately indifferent to his hip pain by failing to refer him to a specialist and failing to address his complaints of pain, the Court will not consider treatments decisions made by Dr. Labby after Leiser filed his amended complaint,

including any claim that she interfered with the approval process for a hip replacement. Those allegations are not included in the amended complaint—they could not be given that Dr. Nelson did not recommend Leiser have hip replacement surgery until nearly three months after Leiser filed his amended complaint.

"Normally, a complaint can seek relief only for events that have already occurred." *Chicago Regional Council of Carpenters v. Village of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011). If a plaintiff wants his complaint broadened to encompass subsequent events, he must move to supplement it. Under Fed. R. Civ. P. 15(d), "[o]n motion and reasonable notice, the court may on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Leiser never moved to supplement his amended complaint, and, given how long this case has been pending and the time and resources devoted to discovery and the briefing of summary judgment, it would be unfairly prejudicial to Defendants to allow him to do so now. Accordingly, if Leiser believes treatment decisions that occurred after April 28, 2020 (the day he filed his amended complaint) violated his constitutional rights, he must raise those claims in a new lawsuit.

In sum, the Court concludes that Leiser failed to exhaust the administrative remedies on his claims that Brunk, Doehling, and Dr. Tannan failed to provide him with constitutionally adequate care prior to his back surgery, that Jaeger, Schroeder, Wuest failed to provide him with needed medical appliances, and that Beier failed to investigate his inmate complaints. Also, Leiser's allegations that Dr. Labby has prevented him from receiving a hip replacement are not before this Court because this alleged misconduct occurred after Leiser filed his amended complaint. Accordingly, these claims must be dismissed without prejudice. The Court will now address the merits of Leiser's remaining claims.

# FACTUAL BACKGROUND

### 1. Leiser's transport from the hospital to his institution following back surgery

On November 30, 2018, Leiser underwent a L4-5 laminectomy and posterior lateral fusion surgery. The surgery was to remove bony pressure on Leiser's spinal canal and nerves and to permanently connect the involved vertebrae to relieve pressure on the nerves causing back, buttocks, hip, and leg pain. Leiser was discharged from the hospital a couple of days later. Defendants assert that there were no specific care recommendations. That day, Defendants Correctional Officers Jennifer Nash and Timothy Soda were instructed to drive to the hospital at about 6 a.m. to provide security for Leiser. Nash was assigned to drive a regular institution van (which is not wheelchair accessible). After Leiser was discharged, he was escorted in a wheelchair to the van, which was parked outside the hospital doors. Because Leiser was restrained at the ankles, hands, and waist, Soda and Nash assisted him in standing and walking to the van. Dkt. No. 109 at ¶¶50, 52-53, 56-57.

There was a divider behind the front seats of the van to separate the front seats from the rest of the van's seating area. According to Leiser, Nash and Soda ordered him to sit in the seat immediately behind the front seats even though there is very little leg room. Leiser asserts that he told them he needed a wheelchair van, but they forced him into the seat and Soda "shoved" his legs in. Leiser states that he was forced to sit sideways for two and a half hours with his face hitting against the divider. Nash and Soda assert that they gave Leiser the option of sitting in the front or middle seat and that Leiser chose the front seat because he did not want to crouch down to get to the middle seat. Nash denies that they forced Leiser to sit sideways. She notes that all inmates are buckled into their seats, and she does not know how Leiser could have been buckled in if he had been sitting sideways. Dkt. No. 109 at ¶¶58-60; Dkt. No. 134 at ¶59.

10

Leiser asserts that Nash drove "like a NASCAR driver" on the way back to the institution, causing Leiser to pass out from the pain of having to sit sideways while being hrown around by Nash's driving. Nash asserts that Leiser did not complain about her driving and she did not intentionally bounce Leiser around by driving over potholes. Nash asserts that she drove straight from the hospital to the institution without stopping. Leiser states that when they arrived at the institution, Nash and Soda "dumped" him into a wheelchair and took him to health services. Dkt. No. 109 at ¶¶63-64; Dkt. No. 134 at ¶¶63, 66.

## 2. Leiser's treatment while in the infirmary

Prior to Leiser arriving at the institution, a hospital nurse called the health services unit and informed Defendant Nurse Katherine Thompson that Leiser would be discharged that day, that he was doing well and walking independently without assistive devices, and that his pain was under control. Nurse Thompson assessed Leiser after he arrived at the institution. She asserts that he did not appear to be in extreme pain and did not ask for pain medication. She did not note any reason to call a provider. Nurse Thompson reviewed Leiser's discharge orders with him, which included no lifting over ten pounds, no pushing or pulling, and recommended walking at least four times per day. There were no recommendations concerning assisted walking devices, oxygen, or urinals. According to Leiser, he told Nurse Thompson he was in pain and asked for pain medication. She said ok, but never returned. Leiser states that he could not walk on his own and required assistance to move. Dkt. No. 109 at ¶¶66-68; Dkt. No. 134 at ¶¶67-68.

Defendants assert that Leiser returned to the institution with two medications for pain: Oxycodone and Methocarbamol (a muscle relaxer). The Oxycodone order was placed for one day, for every three hours as needed; the order expired on December 3, 2018. Before Nurse Thompson left for the night, she entered Leiser's prescription into the computer so a correctional officer could

11

administer it if Leiser asked for it. Defendants assert that Leiser did not request any Oxycodone before the order expired the following day. According to Nurse Thompson, when she returned the next day, she checked on Leiser at about 8 a.m., and although he said his pain was a seven out of ten, he also said, "it's skin pain and muscular pain, I can tolerate it without narcotics." Nurse Thompson asserts that she told Leiser she would ask his provider to order Extra Strength Tylenol. She also ordered a portable urinal for one week because his regular cell did not have a toilet, and she ordered a wheelchair for distance for one month. Leiser's low bunk and low tier restrictions continued, and after he stopped using a wheelchair, he was provided with a walker and a brace for his back. Dkt. No. 109 at ¶¶69-70, 75-76, 80-81, 83, 85, 142.

According to Leiser, Nurse Thomas did not inform him how to get his medication after she left, and he had no way of contacting the correctional officer during the night because he was unable to press the cell emergency button. He states that he asked Nurse Thompson for Oxycodone while he was in the infirmary because he was in severe pain, but she never brought it to him. He states that the next day he told her that his pain was more than ten out of ten and he again asked for his Oxycodone, but she told him to come back at 10 a.m. during medication pass. When he asked at medication pass, the sergeant told him to wait. Then, at 6:00 p.m. he was told the order had expired and he would not receive it. Dkt. No. 134 at ¶¶69-70, 76, 81.

### 3. Leiser's treatment after being released from the infirmary

According to Defendants, when Leiser left the infirmary on December 3, 2018, he had the following medications available for pain management: Methocarbamol to help with pain and stiffness, Tylenol, and Gabapentin. Leiser asserts that Tylenol has never helped him with pain relief and that Gabapentin is not recommended for post-surgery pain relief (Leiser does not clarify

whether it provided him with relief, although it appears that he continued to regularly take it). Dkt. No. 109 at ¶¶84; Dkt. No. 134 at ¶¶84

Dr. Tannan met with Leiser on December 6, 2018. According to Dr. Tannan, Leiser was able to walk a short distance and told Dr. Tannan that his pain was under control with his current medications and that he did not want narcotics. Leiser disputes this and claims he told Dr. Tannan his pain was *not* under control. The next day, Leiser told a nurse that he could no longer stand the pain, so she called Dr. Tannan, who entered an order for Tylenol 3 (Tylenol with codeine) for every six hours as needed with an end date of December 10, 2018. Dr. Tannan explains that it is standard to issue a narcotic short-term, and by this time, Leiser was already eight days out from his surgery. He also explains that he chose Tylenol 3 because the HSU stocks it, so he believed Leiser could receive it more quickly than a different narcotic, which would have to be obtained from the central pharmacy. Leiser received his first dose of Tylenol 3 about an hour after it was prescribed. Dkt. No. 109 at ¶¶90, 92, 95-97; Dkt. No. 134 at ¶¶92-97.

On December 9, 2018, Leiser prepared an inmate complaint asking Dr. Tannan to change the times his medication was distributed from a set time to "as needed." A nurse responded on December 10, explaining to Leiser that his prescription for Tylenol 3 expired that day and that it could not be ordered for "as needed" but had to have a specific schedule that officers were required to follow. Leiser explains that he was not requesting that his medication be distributed "as needed" but that all his medications be distributed at the same time. He was unhappy that Tylenol 3 was distributed at 6:30 p.m. while Gabapentin was distributed at 7:20 p.m. and that McGibbon and Zamzow made him wait the fifty minutes between administering the Tylenol 3 and the Gabapentin. While Leiser's prescription for Tylenol 3 was active, McGibbon provided the medication several

13

times, Zamzow provided it once, and several other officers provided it several times. Dkt. No. 109 at ¶¶99, 101, 114; Dkt. No. 134 at ¶¶101-102.

On December 12, 2018, Nurse Cindy Barter triaged a health service request from Leiser asking that his Tylenol 3 prescription be reinstated. Barter, who lacks the authority to write prescriptions, referred the request to Dr. Tannan. The next day she spoke to Dr. Labby who told her that, given that two weeks had passed since Leiser's back surgery, he should be using over-the-counter pain medications. Dr. Labby did, however, extend Leiser's prescription for a muscle relaxer for ten additional days. Dr. Tannan explains that narcotics should be used only short-term following surgery due to concerns about dependency and abuse. He asserts that narcotics are prescribed only seven to ten days after surgery, and at this point, Leiser was thirteen days post-surgery. Dkt. No. 109, 134 at ¶¶103-107.

On December 17, 2018, Leiser submitted health services requests addressed to Health Services Manager (HSM) Angela Thompson with complaints about his return trip from the hospital, being denied codeine and a urinal, and not being given oxygen. HSM Thompson investigated Leiser's concerns by reviewing his electronic medical records and hospital discharge packet. She then typed a response memorandum that concluded the care Leiser had received following his back surgery was appropriate. On December 20, 2018, Dr. Tannan stopped working at Leiser's institution and was no longer involved in his care. Dkt. No. 109, 134 at ¶¶108, 113.

On January 3, 2019, Nurse Thompson triaged a health services request in which Leiser stated that he no longer needed medical accommodations including a wheelchair. About a week later, On January 10, 2019, Leiser had an offsite UW Neurosurgery follow-up visit. After he returned, Dr. Labby referred Leiser to physical therapy per UW's recommendation. Leiser started

14

physical therapy a week later, on January 16, 2019 and was discharged from physical therapy on January 28, 2019 after four visits. Dkt. Nos. 109, 134 at ¶¶116-122.

**4.    Leiser's complaints of severe right hip pain**

About a month later, on February 28, 2019, Leiser met with Dr. Labby. Dr. Labby asserts that he described some mild low back pain that was radiating into his legs, but he reported the pain had improved since his surgery. Leiser disagrees with this characterization, asserting that he went to Dr. Labby "seeking medical help for the horrible pain [he] was enduring in [his] hip/quadriceps/prosthetic knee/bilateral calf muscle." According to Leiser, Dr. Labby kicked him out of her office and denied his requests for x-rays and soft cuffs. She also ordered that he not be allowed to access the weight room given that he had a low bunk and low tier restriction. Dkt. No. 109 at ¶146; Dkt. No. 134 at ¶145.

Nearly six months later, on August 19, 2019, Leiser was scheduled for a follow-up appointment with Dr. Labby to address his hip pain, but she asserts that he was argumentative, so she ended the appointment. Leiser asserts that Dr. Labby refused to listen to him tell her what was happening with his body, ended the appointment without providing him with any pain medication, and made him wait seven weeks for another appointment even though he was in severe pain. Over the following months, Dr. Labby and Leiser continued to disagree over many issues, including whether he could safely take Naproxen and ibuprofen for his pain, whether he needed to take his cardiac and blood pressure-related medications, and whether an orthopedic consult would be worthwhile given her belief that Leiser's heart conditions and his refusal to take his medications could make it unsafe for him to undergo total hip replacement surgery. Dkt. Nos. 108, 134 at ¶¶147-154.

15

On November 13, 2019, Barter triaged six health services requests in which Leiser stated that he wanted his Naproxen prescription renewed or increased to address his hip pain. Barter referred the requests to Dr. Labby and HSM Thompson and sent Leiser educational materials about coronary artery disease (CAD) and NSAIDS. According to Leiser, despite Dr. Brooks, a neurosurgeon, and Dr. Santa-Cruz, a cardiologist, opining that Leiser could safely use Naproxen and ibuprofen, Dr. Labby stated that she could not "in good conscience" reorder Naproxen in light of Leiser's CAD. She explained that if Leiser were using it sparingly, it might be reasonable, but given his concession that he was using Naproxen consistently and mixing it with ibuprofen from the canteen, she declined to refill the prescription. Dkt. Nos. 109, 134 at ¶¶125-26.

On March 6, 2020, during an office visit with Dr. Labby, Leiser described his hip pain as "well over 10/10." Dr. Labby asserts that, at that point, because she and Leiser had been able to communicate effectively, it appeared that Leiser had been taking his cardiac-related medications consistently, and his blood pressure was relatively well controlled, she decided to order an orthopedic consult. She also ordered a course of physical therapy to evaluate his hip function and strength. In April 2020, at Leiser's request, she ordered x-rays of his knee and hip, which showed severe degeneration in Leiser's right hip. Dkt. Nos. 108, 134 at ¶¶147-154. On April 28, 2020, Leiser filed an amended complaint, which is the operative complaint in this case. Dkt. No. 10.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id*.  All reasonable inferences are construed in favor of the nonmoving party.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*.  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Leiser asserts that Defendant Corrections Officers Nash, Soda, McGibbon, and Zamzow, Nurses Barter and Thompson, HSM Thomson, and Drs. Tannan and Labby violated his constitutional rights when they ignored or recklessly disregarded his severe back and/or hip pain. While Defendants agree that Leiser suffered from objectively serious medical conditions, they dispute Leiser's characterizations of the care he received.  For the reasons explained below, McGibbon, Zamzow, Barter, HSM Thompson, and Dr. Tannan are entitled to summary judgment, but Nash, Soda, Nurse Thompson, and Dr. Labby are not.

Leiser's claims arise under the Eighth Amendment.  The Supreme Court has confirmed that the Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care."  *Gabb v. Wexford Health Sources, Inc*., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted).  The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment.  The Court asks: 1) "whether a

17

plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Id*. (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)).

Because Defendants agree that Leiser's back and hip pain constitute objectively serious medical conditions, the Court will focus its analysis on whether Defendants' response (or lack of response) demonstrated deliberate indifference to his pain. An official is deliberately indifferent if that official was aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997); *Farmer v. Brennan* 511 U.S. 825, 847 (1994). "Something more than negligence or even malpractice is required." *Pyles*, 771 F.3d at 409. Courts defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Pyles*, 771 F.3d at 409. A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id*. This is because "the Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) *cert. denied*, 519 U.S. 1126.

Also, "an inmate can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Greeno v. Daley*, 414 F.3d 645, 654-55 (7th Cir. 2005)). Generally, in that line of cases, prisoners survive summary judgment by showing that officials "failed to conduct necessary tests, ignored specific treatment requests from the inmate, and persisted in offering weak medication—all in the face of repeated protests that the medication was not

18

working." *Id*. The Seventh Circuit stated, "Put most bluntly, faced with an inmate experiencing ongoing suffering from a serious medical condition, a prison physician cannot 'doggedly persis[t] in a course of treatment known to be ineffective' without violating the Eighth Amendment." *Id*. (quoting *Greeno*, 414 F.3d at 655).

## I. The Record Is Sufficient to Allow a Reasonable Jury to Find in Favor of Leiser on his Claims against Nash, Soda, Nurse Thompson and Dr. Labby.

### A. Factual Disputes Preclude Entry of Summary Judgment for Nash and Soda.

Leiser asserts that following major back surgery, Nash and Soda transported him in a van that did not have sufficient room for him to properly sit. According to Leiser, he was roughly forced into the van and made to sit sideways, without support for his back, for two hours. Leiser also asserts that Nash drove recklessly, causing him further pain as he was jostled in his seat and his face banged against the divider separating him from the front seats. Leiser asserts that he was in so much pain that he temporarily passed out during the ride. Nash and Soda dispute Leiser's characterization of his transport home. They explain that Leiser chose to sit in the first row of seats because he did not want to crouch down to access the second row where there was more leg room. They also assert that he was sitting properly in his seat and that he did not complain about Nash's driving on the way home. A jury that believed Leiser's version could reasonably conclude that Nash and Soda were deliberately indifferent to his pain. Accordingly, summary judgment on these claims must be denied.

### B. Factual Disputes Preclude Entry of Summary Judgment for Nurse Thompson.

Leiser was prescribed Oxycodone following his discharge from the hospital. He asserts that, after arriving at the institution, he was in a lot of pain and asked Nurse Thompson if he could have his pain medication. He asserts that she said yes, but then never delivered it to him. Leiser also asserts that she did not tell him how to contact anyone to ask for medication or assistance

during the night. He states that he again requested his pain medication the next morning when she assessed him, but she told him to wait until medication pass. According to Leiser, he never received the prescribed Oxycodone. Nurse Thompson remembers her interactions with Leiser differently. She asserts that Leiser never requested Oxycodone, telling her that, even though he was in pain, he preferred not to take a narcotic. A jury that believes Leiser's account that Nurse Thompson twice failed to provide him with prescribed pain medication upon his request could reasonably conclude that she was deliberately indifferent to his back pain. Accordingly, summary judgment on this claim must be denied.

### C. Factual Disputes Preclude Entry of Summary Judgment for Dr. Labby.

Leiser directs most of his assertions of deliberate indifference at Dr. Labby, with whom he had a very contentions relationship. Leiser began to complain about worsening hip pain following his back surgery near the end of February 2019. He asserts that Dr. Labby failed to adequately address his persistent complaints of worsening pain, she refused to evaluate him or listen to his concerns and would often abruptly end an evaluation, and she delayed referring him to an orthopedic specialist to explore the necessity of a total hip replacement. Leiser asserts that, when he was finally referred to an orthopedic specialist, his bones were grinding on one another, he could barely walk, and he rated his pain at higher than ten out of ten. Upon reviewing Leiser's x-rays, the specialist "strongly recommended" a total hip replacement. Dkt. No. 109 ¶159. Leiser also asserts that Dr. Labby canceled his prescription for Naproxen, which helped to relieve his pain, despite other doctors recommending it and that she did not prescribe any other medications in its place.

Dr. Labby characterizes her interactions with Leiser differently. She asserts that he constantly argued with everything she said, refused to comply with basic requirements such as

having his vitals taken or taking his heart-related medications, and abused his Naproxen prescription by taking it with ibuprofen despite her explaining to him why doing so was unsafe. Dr. Labby does not explain why after canceling Leiser's prescription for Naproxen she did not prescribe an alternative pain medication. She states that Leiser was also taking Gabapentin and had been prescribed Tylenol, but Leiser had told her that these medications were ineffective to address his worsening pain. She also does not explain fully why she waited more than a year to refer him to an orthopedic specialist. She suggests that she did not believe surgery would be appropriate given certain health factors, but it seems that this is the very reason why a specialist should have been consulted. Further, according to Leiser, his health significantly deteriorated while he waited for the referral because he became less and less mobile over time due to the pain.

A jury who believed Leiser's account of his interactions with Dr. Labby could reasonably conclude that she was deliberately indifferent to his hip pain and that her decisions regarding his pain medication and the referral to a specialist substantially deviated from accepted professional judgment. While the record supports a conclusion that Leiser is a challenging patient, he explains that he was in excruciating pain with ineffective medication for more than a year before there was any substantial effort to diagnose his pain and devise a treatment plan. Accordingly, Dr. Labby is not entitled to summary judgment. *See Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (holding that "faced with an inmate experiencing ongoing suffering from a serious medical condition, a prison physician cannot doggedly persist in a course of treatment known to be ineffective without violating the Eighth Amendment" and that "inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference" (internal punctuation omitted)).

## II. No Reasonable Jury Could Find that Dr. Tannan, McGibbon, Zamzow, Barter, and HSM Thompson Were Deliberately Indifferent.

### A. Dr. Tannan Is Entitled to Summary Judgment.

Dr. Tannan's interactions with Leiser following his back surgery were limited. He first met with Leiser on December 6, 2018. At that time, Leiser was prescribed Tylenol and Gabapentin, and Dr. Tannan states that Leiser told him those medications were sufficient to control his pain and he did not want to take a narcotic. Leiser disputes this, stating that his pain was not under control. The next day, Leiser told a nurse that he could not stand the pain. Dr. Tannan was notified, and he prescribed the narcotic Tylenol 3, which he chose because it was stocked at the institution so Leiser would receive it quickly. Leiser received his first dose within one hour. A few days later, Leiser submitted an inmate complaint requesting that his medications be distributed at the same time, but Dr. Tannan did not receive the inmate complaint; rather, Nurse Barker responded to Leiser's request. On December 12, 2018, Leiser requested that his prescription for Tylenol 3 be reinstated. This request was addressed by Dr. Labby. Dr. Tannan stopped working at the institution about week later, on December 20, 2018.

Although Leiser disputes that he told Dr. Tannan his pain was under control, he does not dispute that he stated he did not want to be prescribed a narcotic. The next day, after Leiser informed a nurse that he could no longer stand the pain, Dr. Tannan prescribed a narcotic that he knew was stocked at the institution so Leiser would receive it quickly. This was the last interaction Dr. Tannan had with Leiser before he stopped caring for Leiser. Given the limited nature of their interactions and Dr. Tannan's actions to quickly address Leiser's assertions of increasing pain, no jury could reasonably conclude that Dr. Tannan was deliberately indifferent to Leiser's back pain following his surgery. Dr. Tannan is entitled to summary judgment.

**B. McGibbon and Zamzow are Entitled to Summary Judgment.**

Leiser asserts that McGibbon and Zamzow refused to give him his prescribed pain medication. This assertion is misleading. *See* Dkt. No. 114 ¶¶68-73. According to Leiser, McGibbon and Zamzow refused to deviate from the provider's orders by distributing his medications all at once as Leiser demanded rather than at specific times as specified in the orders. *See* Dkt. No. 134 ¶¶92-97. Leiser asserts that he was made to wait fifty minutes between receiving Tylenol 3 and Gabapentin. While Leiser believes McGibbon and Zamzow should have disregarded the orders and distributed his medications at the same time, no jury could reasonably conclude that their strict adherence to the provider's orders demonstrated deliberate indifference to Leiser's pain. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). McGibbon and Zamzow are entitled to summary judgment.

**C. Barter Is Entitled to Summary Judgment.**

Barter triaged health services requests from Leiser in which he complained that he was in significant pain. Barter, who lacked the authority to prescribe medications or make referrals to outside specialists, Dkt. No. 113 ¶¶7, 42, promptly directed his requests to his providers. She also provided Leiser with educational materials in response to his requests and scheduled visits with nurses and/or providers when he requested one or when she thought one necessary. *Id.* ¶¶30-31, 36, 39. She further explains that she has no authority to give or remove restrictions, such as low-bunk or low-tier restrictions. *Id.* ¶43. Finally, Barter knew Leiser was being constantly monitored, including by outside specialists, a physical therapist, and the health services manager who reviewed his complaints that he was receiving inadequate care, suggesting that she had no reason to believe that the care he was receiving was constitutionally inadequate. Although Leiser insists

23

that she should have done more, no jury could reasonably conclude that she was deliberately indifferent to Leiser's pain. *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (holding that nurses may defer to physicians' instructions unless it is apparent that the physician's orders will likely harm the patient). Barter is entitled to summary judgment.

### D. HSM Thompson Is Entitled to Summary Judgment.

HSM Thompson provides administrative support for the health services unit and supervises nursing staff. She does not provide any direct patient care for inmates; medical care is provided by nursing staff and advanced care providers. Dkt. No. 114 ¶¶3-4. HSM Thompson received written complaints from Leiser about the care he was receiving. According to HSM Thompson, she investigated Leiser's complaints by reviewing his medical records, concluded, based on Dr. Labby's assessment and explanations, that he was receiving adequate care, and communicated her findings to him in detailed memorandums. *Id.* ¶¶46-47, 58-61, 69. HSM Thompson explains that she defers to the judgment of providers in determining a plan for chronic pain management, follow-up testing and diagnosing of chronic back and hip pain, and post-surgical prescription and rehabilitation needs. She asserts that she had no reason to believe that Leiser's medical issues related to his back or hip pain were not being addressed "because he was seen frequently by both nursing staff and advanced care providers, sent for offsite visits with specialists, and he had continual communication with [the health services unit]." *Id.* ¶78.

No reasonable jury could conclude that HSM Thompson was deliberately indifferent to Leiser's conditions. She did not ignore Leiser or discount his complaints; instead, she investigated his claims by reviewing his medical records and confirming that he was in near constant contact with nursing staff, advanced care providers, and outside specialists. Given that her role was administrative in nature and it did not appear that the treatment he was receiving posed a serious

24

risk to his health, HSM Thompson was entitled to defer to his providers' decisions even though Leiser was demanding different treatment. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012); *Franklin v. Hannula*, 850 F. App'x 436, 439 (7th Cir. 2021).

## LEISER'S MOTION FOR SANCTIONS

On December 27, 2021, Leiser filed a motion for sanctions against Nash, who he asserts harassed him by issuing him a conduct report for disobeying orders. Dkt. No. 132. Leiser does not specify what "sanctions" he wants the Court to impose. Nash's alleged misconduct has nothing to do with the issues in this case and occurred nearly two years after Leiser filed his amended complaint. As such, if Leiser believes Nash's conduct is unconstitutional, he may pursue relief in a new lawsuit, but her alleged misconduct is not a proper basis for sanctions in this case.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Leiser's motion for sanctions (Dkt. No. 132 is **DENIED**, and Defendants' motion for summary judgment (Dkt. No. 107) is **GRANTED in part** and **DENIED in part.** Leiser's claims against Diane Brunk, Lori Doehling, Nathan Beier, Terry Jaeger, Ann Marie Wuest, and Zachary Schroeder are **DISMISSED without prejudice** based Leiser's failure to exhaust the available administrative remedies. Leiser's claims against Angela Thompson, Dilip Tannan, Cindy Barter, Todd Zamzow, and Annette McGibbon are **DISMISSED with prejudice**. The Court will schedule a telephonic status conference to discuss next steps with regard to Leiser's claims against Kira Labby, Katherine Thompson, Jennifer Nash, and Timothy Soda.

Dated at Milwaukee, Wisconsin on March 30, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

25